IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

ALAN SCOTT HOBBS,         )
                        )
        Petitioner,     )
                        )
     v.              )      CV 115-121
                        )       (Formerly CR 112-259)
UNITED STATES OF AMERICA,  )
                        )
        Respondent.    )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Petitioner Alan Scott Hobbs filed with this Court a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. The Court **REPORTS** and **RECOMMENDS** the request for an evidentiary hearing be **DENIED**, (doc. no. 4), the § 2255 motion be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

## I.    BACKGROUND

### A.    Pretrial Proceedings

In an indictment returned on December 6, 2012, a grand jury in the Southern District of Georgia charged Petitioner in one count with Possession of a Firearm by a Convicted Felon on or about October 16, 2012, in violation of 18 U.S.C. §§ 922(g)(1) and 924. United States v. Hobbs, CR 112-259, doc. no. 1 (S.D. Ga. Dec. 6, 2012) (hereinafter "CR 112-259"). The indictment also contained a forfeiture allegation, and the charge in count one carried a possible sentence of imprisonment of not more than ten years. Id., doc. nos. 1, 2. The Court appointed attorney Alicia Brooke Jennings to represent Petitioner, and she filed seven

motions on Petitioner's behalf.  Id., doc. nos. 12-19.  Shortly after the government filed its response to Petitioner's motions, Ms. Jennings filed an unopposed request for a psychiatric examination of Petitioner, which the Court granted.  Id., doc. nos. 24, 25, 27.

Upon completion of the competency evaluation and receipt of the psychiatric report, the parties stipulated Petitioner was competent to stand trial, and although he was suffering from a mental disease under the law, that illness did not impair Petitioner's ability to appreciate the wrongfulness of his conduct.  Id., doc. nos. 35, 37, 40.  United States District Judge J. Randal Hall set the matter for trial on July 23, 2012, but at the request of defense counsel, the trial was continued.  Id., doc. nos. 43, 44.  Approximately two weeks later, the grand jury returned a superseding indictment against Petitioner which charged him in one count with Possession of a Firearm by a Convicted Felon on or about July 1, 2012, and on or about October 16, 2012, in violation of 18 U.S.C. §§ 922(g)(1) and 924, and one count of Witness Tampering, in violation of 18 U.S.C. § 1512(b)(1) and (2).  Id., doc. no. 45.  The superseding indictment also included a forfeiture allegation.  Id.  Thus, the superseding indictment added a second, "on or about" date when Petitioner was alleged to have illegally possessed a firearm.   It also added a new charge of witness tampering, which carried a possible sentence of imprisonment of twenty years, thereby increasing Petitioner's sentencing exposure from ten to thirty years of imprisonment.  Id., doc. nos. 45, 46.

Petitioner entered a not guilty plea to both charges, and Ms. Jennings filed another pretrial discovery motion on Petitioner's behalf.  Id., doc. nos. 51, 55.  One week after that motion was filed, Petitioner filed a "Motion To Be Appointed Co-Counsel," and the Court held an *ex parte* hearing on the matter.  Id., doc. nos. 58-59.  At the hearing, Petitioner raised what would become a familiar refrain that Ms. Jennings was "too eager to avoid a trial by

trying to convince [Petitioner] to plead guilty even though [he] is in fact innocent," and he requested that Ms. Jennings be replaced as his appointed counsel. Id., doc. no. 60, p. 1. The Court found no extraordinary circumstances to justify the appointment of substitute counsel for several reasons, including: (1) Petitioner and Ms. Jennings had an open line of communication with no irreconcilable conflict of interest between them, and (2) Ms. Jennings was appropriately preparing for trial, notwithstanding any discussions or recommendation she may have made with respect to plea negotiations with the government. Id. at 2. The Court denied both the request to be appointed co-counsel and to be appointed substitute counsel, and the case continued on its path to trial.

Judge Hall set the case for trial on November 5, 2013, and Ms. Jennings filed a motion to continue the trial date for thirty days because she had requested evidence relevant to the defense that would not be available in time for her to review it and prepare for trial. Id., doc. nos. 63, 67. Judge Hall granted the request, scheduled the pretrial conference for December 20, 2013, and reset the trial for January 6, 2014. Id., doc. no. 69. At the pretrial conference, Ms. Jennings orally requested to continue the trial so the state court could resolve a pending motion for new trial on Petitioner's prior terroristic threats conviction that the government had served notice would be used for impeachment if Petitioner testified at trial. Id., doc. nos. 66, 115 (PTC Hr'g), pp. 6-10. Judge Hall denied the request for a continuance, finding that the pendency of the motion was irrelevant to a request for continuance because Rule 609 of the Federal Rules of Evidence allows for admissibility even if an appeal of a prior conviction is pending. PTC Hr'g 10.

The credibility of one of the government's main witnesses, Ms. Rachel Jefferies, was also discussed at the pretrial conference. Ms. Jefferies was Petitioner's live-in girlfriend and

the victim of Petitioner's battery that precipitated the 9-1-1 call resulting in law enforcement officers coming to Petitioner's house in October of 2012. Once at the house, officers discovered the firearm that led to Petitioner's arrest, and ultimate conviction, for illegal possession by a convicted felon. Id. at 13.

Ms. Jefferies was also the witness with whom Petitioner allegedly tried to tamper, as set forth in count two of the superseding indictment. CR 112-259, doc. no. 45. Judge Hall heard argument that the theory of the defense would be Ms. Jefferies either lied about or made up the events leading to the charges brought against Petitioner. The parties argued about the admissibility of evidence that would corroborate information she reported to law enforcement on the night they came to Petitioner's house and confiscated the firearm at issue. PTC Hr'g 5, 12-16. Judge Hall reserved ruling on several of the evidentiary issues and told the parties he would rule on the unresolved issues prior to the start of trial. Id. at 16-18.

On the eve of trial, Ms. Jennings filed, at Petitioner's request, a motion to withdraw as counsel. CR 112-259, doc. no. 78. Judge Hall held an *ex parte* hearing on the motion, prior to conducting *voir dire*, in which he heard arguments in favor of the motion from both Petitioner and Ms. Jennings. Ms. Jennings explained that she and Petitioner were "at total odds with regard to how he should present his testimony to the jury should he choose to testify during the trial," resulting in a "total breakdown in communication." Id., doc. no. 135, p. 2. Nevertheless, Ms. Jennings reported she was "totally prepared" to go to trial but was seeking guidance from Judge Hall on how to proceed. Id. at 3. For his part, Petitioner complained to Judge Hall that he did not appreciate Ms. Jennings pointing out a lack of corroboration for his explanation of innocence, did not have faith in the results of her legal

research regarding certain self-exculpatory evidence he wanted to offer, and did not believe Ms. Jennings had prepared to the best of her ability because she had urged him to take a plea deal. Id. at 3-8. Having reviewed the docket and recalled his observations of Ms. Jennings' performance in the case, including at the pretrial conference, Judge Hall found Ms. Jennings had filed appropriate pretrial motions, was prepared to proceed to trial, found no fault in her offering advice to Petitioner about the option of accepting a plea agreement, and determined that granting the motion would delay and disrupt the scheduled trial. Id., doc. nos. 79, 135.

**B. Trial**

**1. Evidentiary Rulings**

After jury selection but before opening arguments, Judge Hall announced his rulings on several of the outstanding evidentiary issues raised at the pretrial conference. He deferred ruling on whether the government could use Petitioner's 1985 habitual violator conviction and 2007 conviction for terroristic threats unless and until Petitioner testified and the nature of the testimony could be determined. Id., doc. no. 119 (Trial Tr.), p. 14. The Court allowed introduction of evidence of the events leading up to the arrival of law enforcement officials at Petitioner's house on the night of his arrest, but disallowed the graphic pictures of Ms. Jefferies' injuries suffered at the hands of Petitioner as too prejudicial. Id. at 14-15. Judge Hall said he would reconsider his ruling on the admissibility of the injury pictures if the extent or seriousness of the injuries were put at issue through cross-examination or Petitioner's own testimony. Id. at 15, 22-23. Notably, Judge Hall also said that if Ms. Jefferies' mental health treatment were raised as an explanation for an inability to remember or perceive events, or if her credibility became an issue, the Court would reconsider whether the pictures of Ms. Jefferies' injuries could be presented to the jury. Id. at 22-23.

## 2.    Evidence Related to Possession of a Firearm

The trial testimony revealed that after consuming approximately eighteen beers throughout the day of October 15, 2012, Petitioner came into the bedroom where Ms. Jefferies was asleep, climbed on top of her, told her to remove her underwear, and then threatened to kill her while putting his hands over her face, nose, and mouth to keep her from breathing.  Id. at 52, 57-58.  Ms. Jefferies managed to escape the bedroom, but Petitioner caught up with her in the living room and punched her repeatedly in the head, resulting in a black eye, split lip, and a loose tooth.  Id. at 58, 105.  After Ms. Jefferies began crying, Petitioner ordered her back into the bedroom, where he hit her three more times before passing out.  Id. at 59.

After Petitioner passed out, Ms. Jefferies called her close friend of twenty years, Ms. Rhonda Peloquin, to ask what she should do.  Id. at 59, 98, 103.  Upon deciding to call 9-1-1, Petitioner made a three-way call with Ms. Peloquin also on the line.  Id. at 60, 104.  Ms. Jefferies reported the beating and told the 9-1-1 operator there was a gun in the house.  Id. at 61, 104.  When officers arrived at the house, they removed Petitioner from the house, and when she told them about the gun, she was told an officer could not retrieve it from the house.  Id. at 61.

When Ms. Jefferies asked if she could get it for them, an officer accompanied her to the attic location.  Ms. Jefferies went up the ladder and retrieved the gun from a hole in the floor of the attic.  Id. at 63-64.  She testified she went all the way into the attic to retrieve the gun, but the officer testified Ms. Jefferies reached "within arm's reach of the top of the attic" to retrieve the gun and hand it to him.  Id. at 43, 64.  The officer also responded affirmatively

when asked if he observed Ms. Jefferies "enter the attic with some difficulty" and "get up into the entrance." Id. at 43, 46.

Ms. Jefferies and the officer had conflicting recollections of whether Ms. Jefferies pulled down the attic door herself or had the officer do it for her. Id. at 45, 49, 61. From where he was standing at the base of the attic door, the officer could not see where the gun was located in the attic. Id. at 50. The government admitted as evidence photographs of the attic. Id. at 62, 64.

During cross-examination, Ms. Jennings elicited testimony that Ms. Jefferies never actually saw Petitioner with the gun on the night of his arrest but had been the one who retrieved it from the attic. Id. at 82. She also highlighted that at one time, Ms. Jefferies reported to law enforcement that she had actually been the one to hide the gun in the attic. Id. at 84. Ms. Jennings also elicited testimony explaining Ms. Jefferies had lived in Petitioner's house, with unrestricted access to all parts of the house, when he was incarcerated between 2007 and 2009. Id. at 84-85.

Ms. Jennings further highlighted Ms. Jefferies had twice relied on Petitioner's residence to establish stable housing in a custody battle concerning her daughter but had some problems because the Department of Family and Child Services (D.F.A.C.S.) had an issue with a convicted felon being present in the residence. Id. at 85-87. Ms. Jefferies testified she had been able to regain custody of her daughter on a prior occasion when she stated Petitioner no longer lived in the residence. Id. at 87. When the government objected to the relevance Ms. Jennings' line of questioning, she responded, in front of the jury, that it was relevant to establish motive. Id. at 86. Ms. Jennings concluded her cross-examination

by getting Ms. Jefferies to acknowledge she was involved in a second custody battle, and it was "really important for [her] to get custody of her daughter back." Id. at 87.

On the night officers came to Petitioner's residence because of the 9-1-1 call, Petitioner was arrested for family violence battery, but denied the gun retrieved from the attic was his. Id. at 41-42, 54. Indeed, as a convicted felon on parole, Petitioner was prohibited from owning a gun and was not allowed to consume alcohol. Id. at 92-93, 95-96. According to Ms. Jefferies, however, not only did the gun belong to Petitioner, but he had used it several months prior to his arrest, in July 2012, to shoot at a barking dog and point it at her during a beating inflicted because Ms. Jefferies had taken too long to fix a problem with the internet connection in the house. Id. at 69-70. It was during the barking dog incident that Ms. Jefferies saw Petitioner retrieve the gun from the attic. Id. at 70-71. Ms. Peloquin, who admitted a dislike for Petitioner and how he treated Ms. Jefferies, also testified she had twice heard Petitioner reference having a gun, either in the attic or "up there." Id. at 98-101. Ms. Peloquin's recollection of how many times she heard Petitioner reference having a gun changed during the course of the investigation and trial from once to twice. Id. at 110-12.

Neither Ms. Jefferies nor Petitioner's fingerprints were identified on the gun or the ammunition in it. Id. at 119. Special Agent Ronald Rhodes with the Bureau of Alcohol, Tobacco, and Firearms testified it was not unusual to be unable to lift identifiable fingerprints from a gun, and the absence of prints does not mean that someone has not handled a gun. Id. at 121-22.

### 3.    Evidence Related to Witness Tampering

After Petitioner's arrest, SA Rhodes spoke with Ms. Jefferies in December of 2012 to confirm what had occurred on October 16, 2012. Id. at 72, 122. Ms. Jefferies told SA

Rhodes that what she reported in October was what had actually occurred, and SA Rhodes believed the evidence corroborated the initial statement she gave police. Id. at 72, 124. However, Ms. Jefferies also reported that Petitioner had been sending letters asking her to change her story. Id. at 72. Ms. Jefferies did not change her story until January 11, 2013, when, after receiving multiple letters and visiting Petitioner several times in jail, she told SA Rhodes the gun belonged to Petitioner but he did not know it was in the house. Rather, Petitioner's sister gave it to Ms. Jefferies sometime in 2007, Ms. Jefferies hid it in the attic, but then she was supposed to have sold it to have work done on her car. Id. at 74. Although the letters never explicitly asked Ms. Jefferies to lie, she testified that what he was asking her to say was "definitely" a lie. Id. at 87-88.

SA Rhodes did not believe the new story and testified it was not unusual for a victim of domestic violence to change her story so as to smooth over the relationship with the abuser. Id. at 123-24. After Ms. Jefferies told SA Rhodes this new story that would supposedly exonerate Petitioner, she began to have second thoughts and with the encouragement of Ms. Peloquin, re-contacted SA Rhodes. Id. at 77, 107-09. In June of 2013, Ms. Jefferies told SA Rhodes she had lied when she changed her story in January, and her initial reports in October and December of 2012 were actually correct. Id. at 77-78.

### 4. Motion for Judgment of Acquittal and Closing Arguments

At the close of the government's evidence, Ms. Jennings moved for a judgment of acquittal, arguing the government had not met its burden to prove Petitioner had knowledge the gun was in his home, and as to the witness tampering, the government had not proved a "consciousness of corrupt persuasion" because Petitioner never asked Ms. Jefferies to lie. Id. at 147. She emphasized the testimony that Ms. Jefferies had lied during the investigation of

the case and had given numerous inconsistent statements.  Id. at 148.  The government argued there was both direct and circumstantial evidence Petitioner knowingly possessed the gun recovered from the attic, and as to the second charge, Petitioner had repeatedly asked Ms. Jefferies to tell a story that was not true.  Id. at 147-48.  Judge Hall summarized the evidence that had been presented during the course of trial, noting where certain disputed evidence had been corroborated by more than one witness and determined a rational trier of fact could find guilt beyond a reasonable doubt on both charges.  Id. at 149-54.  Thus, he denied the defense motion.  The defense did not put up any evidence, and the case proceeded to closing arguments.

The government recounted the details of Petitioner's attack on Ms. Jefferies the night of his arrest, emphasized the corroboration of Ms. Jefferies' testimony that Petitioner had hidden the gun in the attic, and argued Petitioner had attempted to influence Ms. Jefferies to change her story to exonerate him through letters and direct communication.  CR 112-259, doc. no. 130, pp. 13-23, 31-34.  In her closing argument, Ms. Jennings emphasized Ms. Jefferies was the one who knew where to find the gun and give it to the officer at the house and that she had full, unrestricted access to the house for two years while Petitioner was incarcerated.  Id. at 25-26.

Ms. Jennings also pointed out at least four credibility issues with Ms. Jefferies' testimony:  (1) she said the officer pulled open the attic access but the officer said she did it herself; (2) her testimony was inconsistent as to where she had seen the gun when Petitioner used it in July and where she said she found it when she turned it over to the officer in October; (3) she lied during the course of the investigation by her changing stories to SA Rhodes; and (4) she had a motive to testify so as to make sure Petitioner could not return to

the home, which would help her efforts to regain custody of her daughter. Id. at 26-27. Ms. Jennings was able to impeach Ms. Jefferies testimony in all of these ways without ever running afoul of Judge Hall's evidentiary ruling at the beginning of the case that if there were a question about Ms. Jefferies' ability to remember or perceive events as suggested by arguments about mental health, he would consider admitting the graphic pictures of Ms. Jefferies' injuries on the night of Petitioner's arrest. Trial Tr. 22-23. As to the witness tampering charge, Ms. Jennings emphasized Ms. Jefferies' testimony that Petitioner never directly asked her to lie and actually wrote her letters asking her to tell the truth. CR 112-259, doc. no. 130, p. 29.

### 5. Verdict

The jury convicted Petitioner of the felon in possession charge, but acquitted him of the witness tampering charge. Trial Tr. 159. Thus, Ms. Jennings won Petitioner an acquittal on the charge carrying the most serious statutory penalty of twenty years. Ms. Jennings also filed a motion for acquittal and new trial on the felon in possession charge, but Judge Hall denied both, finding the evidence "amply" supported the guilty verdict. CR 112-259, doc. nos. 93-95.

### C. Sentencing

The United States Probation Office prepared the Presentence Investigation Report (PSI), which provided for a Total Offense level of twenty and a Criminal History Category of IV. PSI ¶¶ 20, 66. Petitioner did not file any objections to the sentencing calculation, but offered several "points" outlining "clarifications" to the information in the PSI that did not materially impact the sentencing calculation. See PSI Add. The government argued Petitioner's Offense Level should be increased by two points under U.S.S.G. § 3C1.1 for his

attempted obstruction of justice based on the testimony of Ms. Jefferies and Ms. Peloquin that Petitioner sent letters and directly communicated with Ms. Jefferies in attempt to get her to exonerate Petitioner on the felon in possession charge.  See id.

Prior the sentencing hearing, Petitioner filed a motion requesting the appointment of new counsel, and at Petitioner's request, Ms. Jennings filed a motion to withdraw.  CR 112-259, doc. nos. 98, 101.  Judge Hall held an *ex parte* hearing prior to sentencing, and Ms. Jennings explained that since reviewing the PSI and submission of Petitioner's "points" in response, there had been a breakdown in communication.  Id., doc. no. 117.  Relying on information from his book Busted by the Feds, Petitioner argued Ms. Jennings had not spent sufficient time considering and addressing his concerns about the information in the PSI, and combined with the unsatisfactory performance of his different counsel representing him in state court on his motion for a new trial on his terroristic threats conviction, he felt the PSI contained inaccuracies that would unfairly influence his sentence.  Id. at 6-16.

Judge Hall found no reason to appoint new counsel in the case, but informed Ms. Jennings she could re-urge her motion to withdraw at the conclusion of sentencing.  Id. at 21-22.  Dissatisfied with Judge Hall's ruling, Petitioner requested, and received, permission to proceed *pro se*.  Id. at 24.  Ms. Jennings was appointed as stand-by counsel, and the proceedings moved on to sentencing.  Id.

Judge Hall allowed Petitioner to argue a multitude of objections to the PSI that had not been timely raised.  CR 112-259, doc. no. 118 (Sent. Tr.) 3-44.  Petitioner's arguments ranged from his age changing since the date of the creation of the report, (id. at 4), to an argument that he did not cause serious physical injury to Ms. Jefferies on the night of his arrest because she did not require hospital care, (id. at 20-21, 43), to an assertion that his

assault of Ms. Jefferies "was some kind of sleepwalking incident . . . [that] might have been caused by [Ms. Jefferies] spiking [his] beer," (id. at 38).   When Petitioner finished his presentation, the government argued in favor of its request for a two-point enhancement for obstruction of justice.  Id. at 44-45.   As Judge Hall had twice previously ruled a rational jury could find beyond a reasonable doubt that Petitioner engaged in witness tampering, both at the close of the evidence and in ruling on post-verdict motions, Judge Hall concluded the preponderance of the evidence standard applied at sentencing had been satisfied and ordered the two point enhancement be added.  Id. at 47-48.

With a new Total Offense level of twenty-two and a Criminal History Category of IV, Petitioner's advisory sentencing guideline range was sixty-three to seventy-eight months. PSI ¶¶ 16, 20, 66.  Judge Hall sentenced Petitioner to sixty-eight months of imprisonment. CR 112-259, doc. no. 106.

### D.     Appeal

Petitioner had new counsel appointed for his appeal.   Petitioner argued the Court erred in denying his request to be appointed as his own co-counsel, denying Ms. Jennings' motion to withdraw on the morning of trial, denying his motion for a continuance of the trial based on his pending motion for a new trial on his state conviction for making terroristic threats, and failing to adequately explain the factual basis for enhancing his sentence under U.S.S.G. § 3C1.1 for obstruction of justice.  (Doc. no. 9, Ex. A, Pet'r's App. Br.)   The Eleventh Circuit affirmed the conviction and sentence.  United States v. Hobbs, 619 F. App'x 843 (11th Cir. 2015).

**E.      § 2255 Motion**

Petitioner now asserts Ms. Jennings provided ineffective assistance of counsel in nine

different ways:

> (1)      failing to subpoena Ms. Jefferies' psychiatric records;
>
> (2)      failing to subpoena Ms. Jefferies' psychiatrist;
>
> (3)      failing to question Ms. Jefferies about losing custody of her daughter;
>
> (4)      failing to admit sooner that she and Petitioner had a "complete breakdown in communication";
>
> (5)      failing to prepare Petitioner or herself sooner for his testimony;
>
> (6)      failing to object to the numerous bad acts alleged by Ms. Jefferies and Ms. Peloquin;[1]
>
> (7)      failing to object to an improper question by the prosecutor concerning whether SA Rhodes knew Ms. Jefferies was lying when she changed her original statements about how the gun came to be in the attic;
>
> (8)      failing to make a reasonable inference in her closing argument about why Ms. Jefferies would be "extremely nervous" talking to SA Rhodes in June of 2013; and
>
> (9)      failing to question Ms. Jefferies about the exact location where she retrieved the gun.

(See generally doc. nos. 1, 12.)

**II.    DISCUSSION**

In his reply brief, Petitioner concedes the government's position that any possible

error by counsel during the closing argument concerning Ms. Jefferies' nervousness in

speaking with SA Rhodes (ground eight) was cured by Judge's Hall's jury instructions.

---

[1]In his original § 2255 motion, Petitioner alleged, without any detail whatsoever, a failure to object to numerous bad acts detailed by Ms. Jefferies.  (Doc. no. 1, p. 9.)  In his reply brief, Petitioner clarified he meant to complain about the bad acts alleged by Ms. Peloquin.  (Doc. no. 12, pp. 10-11.)

(Doc. no. 9, pp. 26-27; doc. no. 12, p. 11.)  Accordingly, Petitioner is not entitled to relief on this claim, and eight claims remain.

The remaining claims can be broken down into three categories:  (1) failing to sufficiently challenge Ms. Jefferies' credibility, grounds one, two, three, and nine; (2) failing to object to certain testimony, grounds six and seven; and (3) failing to timely recognize a breakdown of the attorney-client relationship, thereby hampering trial preparation, grounds four and five.  Petitioner has not established he received ineffective assistance in any respect.

### A.    No Evidentiary Hearing Required

Section 2255 does not require that the Court hold an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. . . ."  Winthrop-Redin v. United States, 767 F.3d 1210, 1216 (11th Cir. 2014) (quoting 28 U.S.C. § 2255(b)).  "A hearing is not required on patently frivolous claims or those which are based upon unsupported generalizations.  Nor is a hearing required where the petitioner's allegations are affirmatively contradicted in the record."  Holmes v. United States, 876 F.2d 1545, 1553 (11th Cir. 1989) (citation omitted).  Moreover, a petitioner is not entitled to an evidentiary hearing where he asserts "merely conclusory allegations unsupported by specifics or contentions that in the face of the record are wholly incredible." Tejada v. Dugger, 941 F.2d 1551, 1559 (11th Cir. 1991) (citation omitted); see also Lynn v. United States, 365 F.3d 1225, 1238-39 (11th Cir. 2004).

While ineffective assistance of counsel claims often require a hearing for development of an adequate record, an evidentiary hearing is not required every time such a claim is raised.  Rosin v. United States, 786 F.3d 873, 878-79 (11th Cir. 2015); Vick v. United States, 730 F.2d 707, 708 (11th Cir. 1984).  For example, because the deficient

performance prong of ineffective assistance is judged by "whether counsels' representation fell below an objective standard of reasonableness, not whether counsel could provide some explanation for their actions," an evidentiary hearing exploring strategic decisions is not automatically required.  Thomas v. United States, 596 F. App'x 808, 810 (11th Cir. 2015). When the Court "can conceive of a reasonable motivation for counsel's actions, [it] will deny a claim of ineffective assistance without an evidentiary hearing."  Gordon v. United States, 518 F.3d 1291, 1302 (11th Cir. 2008).  Because Petitioner's claims lack merit as a matter of law, or are otherwise affirmatively contradicted by the record, no evidentiary hearing is necessary, and Petitioner's request for one should be denied.  (Doc. no. 4.)

**B.**     **Under Strickland v. Washington, Petitioner Bears a Heavy Burden on an Ineffective Assistance of Counsel Claim.**

Ineffective assistance of counsel claims are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  See Massaro v. United States, 538 U.S. 500, 505 (2003); United States v. Armstrong, 546 F. App'x 936, 940 (11th Cir. 2013).  Under the first prong, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  In this regard, "[a] petitioner must overcome a strong presumption of competence, and the court must give significant deference to the attorney's decisions."  Hagins v. United States, 267 F.3d 1202, 1204-05 (11th Cir. 2001).

Strategic decisions are entitled to a "heavy measure of deference."  Strickland, 466 U.S. at 691.  Indeed, "strategic choices are 'virtually unchallengeable.'"  Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998) (citing Strickland, 466 U.S. at 690).  "[A] court should be highly deferential to those choices made by defense counsel in the conduct of

a trial that are arguably dictated by a reasonable trial strategy." Devier v. Zant, 3 F.3d 1445, 1450 (11th Cir. 1993). "Which witnesses, if any, to call . . . is the epitome of a strategic decision, and it is one that [the Court] will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (*en banc*). To show that an attorney's choice of strategy is unreasonable, a petitioner must show that no competent counsel would have made such a choice. Strickland, 466 U.S. at 690.

Thus, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. "The relevant question is not what actually motivated counsel, but what reasonably could have motivated counsel." Gordon, 518 F.3d at 1301. "Given the strong presumption in favor of competence, the petitioner's burden of persuasion – though the presumption is not insurmountable – is a heavy one." Fugate v. Head, 261 F.3d 1206, 1217 (11th Cir. 2001) (citation omitted). "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer . . . could have acted, in the circumstances, as defense counsel acted . . . ." Ward v. Hall, 592 F.3d 1144, 1164 (11th Cir. 2010) (citing Waters, 46 F.3d at 1512).

Under the prejudice prong of Strickland, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. As the Eleventh Circuit has ruled, a petitioner must affirmatively prove prejudice that would undermine the results of the proceedings because "attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. That the errors had some

conceivable effect on the outcome of the proceeding is insufficient to show prejudice." Butcher v. United States, 368 F.3d 1290, 1293 (11th Cir. 2004) (citations and internal quotations omitted). Indeed, the Court must examine the entirety of counsel's performance and the effect of such "in light of the record as a whole to determine whether it was reasonably probable that the outcome would have been different." Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989).

### C. Because Ms. Jennings Performed Effectively in Challenging Ms. Jefferies' Credibility, There Is No Merit to Grounds One, Two, Three, and Nine.

#### 1. Ms. Jefferies' Mental Health Treatment

In grounds one and two, Petitioner contends Ms. Jennings should have impeached Ms. Jefferies with evidence of her mental health condition, which Petitioner describes as "schizoaffective disorder," by issuing subpoenas to obtain her mental health records and compel her psychiatrist to testify at trial. (Doc. no. 1, p. 4.) Petitioner unsuccessfully raised these mental health issues in his direct appeal as part of his argument concerning alleged prejudice from not being allowed to act as co-counsel with Ms. Jennings, (doc. no. 9, Ex. C, pp. 19, 20), and they likewise fail here.

The government concedes, as it must, that the mental state of a witness may be relevant and the focus of cross-examination, and the medical documentation of a witness' mental state may likewise be relevant. (Doc. no. 9, p. 17 (citing United States v. Lindstrom, 698 F.2d 1154, 1167 (11th Cir. 1983) and United States v. Partin, 493 F.2d 750, 762 (5th Cir. 1974).) Where Petitioner's argument falters, however, is his assumption that a subpoena would automatically be granted under Rule 17, and that if the records were produced and the

psychiatrist subpoenaed, the records and testimony would have survived *in camera* inspection by the Court prior to use at Petitioner's trial.

Subsection (c)(1) of Fed. R. Crim. P. 17 provides as follows: "A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates." The rule "was not intended to provide a means of discovery for criminal cases." United States v. Nixon, 418 U.S. 683, 698 (1974). "Rather, the rule only reaches specifically identified documents that will be admissible as evidence at trial, provided that the application for the subpoena is made in good faith." United States v. Silverman, 745 F.2d 1386, 1397 (11th Cir. 1984).

In order to obtain production prior to trial under Rule 17(c),

> [T]he moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

Nixon, 418 U.S. at 699-700. The requesting party must therefore "clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." Id. at 700.

Beyond these technical requirements, as to attempting to require Ms. Jefferies' psychiatrist to testify about any subpoenaed records or doctor-patient relationship, the defense would have had to overcome the psychotherapist-patient privilege. Jaffe v. Redmond, 518 U.S. 1, 15 (1996) ("confidential communications between a licensed psychotherapist and her patients in the course of diagnosis and treatment are protected from the compelled disclosure under Rule 501 of the Federal Rules of Evidence"). While the law does allow for exceptions to the privilege, such as a defendant's Sixth Amendment

confrontation rights, a defendant attempting to pierce the privilege faces the uncertain proposition of having to convince the court in an *in camera* proceedings the weighing process should come down in favor of disclosure. See United States v. Blake, No. 13-80054-CR, 2014 WL 1764679, at *4-8 (S.D. Fla. Mar. 25, 2014).

Thus, the process for subpoenaing Ms. Jefferies' mental health records and psychiatrist's testimony would have been "infused with . . . uncertainty." (Doc. no. 9, p. 19.) As detailed herein, Ms. Jennings did impeach Ms. Jefferies on the motivation for her testimony and did it in a way that (1) prevented the jury from seeing graphic pictures of the injuries Petitioner inflicted on Ms. Jefferies; (2) yet allowed her to ask the jury to believe other helpful portions of Ms. Jefferies testimony, including that she had once claimed to have hidden the gun in the attic herself and that Petitioner never specifically ask her to lie. Trial strategy, including which witnesses to call and how to question or cross-examine them, is entitled to significant deference. Strickland, 466 U.S. at 691; Waters, 46 F.3d at 1512; Devier, 3 F.3d at 1450. Petitioner fails to show that no competent counsel would have followed the trial strategy selected by Ms. Jennings with respect to Ms. Jefferies' mental health treatment, as challenged in grounds one and two.

### 2. Failing to "Properly" Question Ms. Jefferies

Petitioner claims in ground three Ms. Jennings "was ineffective for not questioning Mrs. Jefferies at all about losing custody of her daughter" for a second time in 2012. (Doc. no. 1, p. 7.) That assertion is factually incorrect because Ms. Jennings questioned Ms. Jefferies' about losing her daughter "before . . . back in 2009," regaining custody, and then

emphasizing it was important to "regain" custody.[2]  Trial Tr. 86-87.  In his reply brief,

Petitioner attempts to tie this claim back to Petitioner's mental health by complaining Ms.

Jennings did not "properly" question Ms. Jefferies about why she lost custody, which

Petitioner suggests without evidence was because Ms. Jefferies was involuntarily committed

and/or was a danger to her child.  (Doc. no. 12, pp. 7-8.)

In questioning Ms. Jefferies, Ms. Jennings elicited Ms. Jefferies lost custody of

her daughter, had "a problem with D.F.A.C.S.," and stated before the jury in response to a

government objection that Ms. Jefferies' custody troubles had a bearing on the motive for

Ms. Jefferies' testimony.  Trial Tr. 85-87.  She did all of this without running afoul of Judge

Hall's evidentiary ruling that if Ms. Jefferies' mental health, including an ability to recall and

perceive events were put at issue, he would revisit the admissibility of graphic pictures of

Ms. Jefferies' injuries caused by Petitioner's beating.

Petitioner also claims in ground nine that Ms. Jennings failed to "properly" question

Ms. Jefferies about where she found the gun in the attic because Ms. Jefferies' testimony

differed from the officer who stood by while Ms. Jefferies retrieved the gun.  (Doc. no. 1, p.

9; doc. no. 12, p. 11.)  The record reflects Ms. Jennings did question Ms. Jefferies about

where she found the gun in the attic, and elicited testimony that at one time, Ms. Jefferies

told SA Rhodes she had hidden the gun in the attic.  Trial Tr. 82-84.  Ms. Jennings then

highlighted the discrepancies in Ms. Jefferies' testimony as contrasted with the officer in her

closing argument.  CR 112-259, doc. no. 130, pp. 26-27.  She provided the jury with a bullet

---

[2]In her closing argument, Ms. Jennings revisited this point when she highlighted Ms. Jefferies had a motive to testify against Petitioner because she was "in an active proceeding to try to regain custody" and that Petitioner's status as a convicted felon had been a problem for Ms. Jefferies when she "lost custody before back in 2009."  CR 112-259, doc. no. 130, p. 27.

point list of problems with Ms. Jefferies testimony, and then Judge Hall instructed the jury

on their job to decide whether to believe what each witness said. Id. at 38-39. Petitioner

simply disagrees with the conclusion reached by the jury and attempts in hindsight to guess

what the jury may have decided had a question been asked of Ms. Jefferies in a different

way.

Trial strategy, including which witnesses to call and how to question or cross-

examine them, is entitled to significant deference. Strickland, 466 U.S. at 691; Waters, 46

F.3d at 1512; Devier, 3 F.3d at 1450. Petitioner has not established Ms. Jennings' trial

strategy on how to question Ms. Jefferies was objectively unreasonable, and he is not entitled

to relief on grounds three and nine. See Surles v. United States, CR. No. 1:08-345 / CV No.

1:12-3510, 2016 WL 675382, at *3 (N.D. Ga. Jan. 25, 2016), *adopted by*, 2016 WL 1388037

(N.D. Ga. Apr. 8, 2016).

### 3.      No Prejudice

Even if Petitioner had established deficient performance by Ms. Jennings with respect

to grounds one, two, three, and nine – which he has not – he would still not be entitled to

relief because he has not shown prejudice. The proof of guilt on the felon in possession

charge did not rely solely on the testimony of Ms. Jefferies. To the contrary, as recounted by

Judge Hall when denying the motion for judgment of acquittal, (Trial Tr. 149-54), and as

presented by the government in its response to the § 2255 motion, (doc. no. 9, p. 20), the

testimony of Ms. Jefferies was corroborated by more than one witness.

> The evidence that the Court heard consisted of Deputy Michael
> Woodard of the Richmond County Sheriff's Office who was one of the two
> deputies dispatched to the Maddox Road residence on the night of the incident.
> Deputy Woodard testified that the alleged victim of that incident, Ms.

Jefferies, informed him of the presence of a firearm - - the firearm that is the subject of this case in the [Petitioner's] house. . . .

The testimony of Deputy Woodard is that Ms. Jefferies went into the attic, retrieved the weapon, and handed it to him indicating that it was, in fact, the [Petitioner's] weapon. The deputy also testified that the scene in the home was consistent with the 9-1-1- report that had previously been made by Ms. Jefferies. The 9-1-1 call also indicates that Ms. Jefferies informed the 9-1-1 operator of the presence . . . of the firearm in the home.

Then there was the testimony of Rachel Jefferies who pointed to or asserted that the firearm in the home belonged to the [Petitioner] in this case. She specifically denied the firearm was hers. She indicated that her understanding that the firearm had been provided to the [Petitioner] by his grandfather. Her - - she also testified as to other incidents in the home involving the firearm; specifically, actions by the [Petitioner] in threatening her with the firearm on occasions prior to the night in question.

Her testimony was then corroborated by Mrs. Rhonda Peloquin who testified that she overheard two conversations with Ms. Jefferies and the [Petitioner] where he threatened the use of the weapon. She testified she never knew Ms. Jefferies to either own, possess, or shoot a firearm and her testimony as to the incident or to what occurred on the night of the police call was fairly consistent with the testimony of Ms. Jefferies.

Trial Tr. 150-51.

Petitioner repeatedly suggests that Ms. Jefferies' testimony, as well as that of Ms. Peloquin, was not credible or reliable, but "the jury has exclusive province over [the credibility] determination." United States v. Johnson, No. 13-14676, 2016 WL 1019266, at *5 (11th Cir. Mar. 15, 2016) (citing United States v. Chastain, 198 F.3d 1338, 1351 (11th Cir. 1999)); see also Castle v. Sangamo Weston, Inc. 837 F.2d 1550, 1559 (11th Cir. 1988) ("Assessing the weight of evidence and credibility of witnesses is reserved for the trier of fact."). He insists if only *his* questions had been asked in the manner he preferred, the outcome would have been different. But the Sixth Amendment does not require unlimited inquiry into potential witness bias in any way demanded by a defendant. Johnson, 2016 WL

1019266, at *6.  Rather constitutional demands are satisfied when sufficient facts are exposed to allow a jury to draw inferences regarding credibility, including any motive to lie. Id.

Petitioner, even now, cannot say with certainty what those mental health records and testimony would have revealed such that it would have changed the outcome of his case. Petitioner argues the records should have been obtained to determine "if Ms. Jefferies has schizophrenia or not."  (Doc. no. 12, p. 1.)  He also claims that Ms. Jefferies was involuntarily hospitalized for "acting in a very bizarre manner in public."  (Doc. no. 1, p. 4.) But there is nothing offered to suggest or establish Ms. Jefferies misperceived or misinterpreted anything about which she testified, particularly with respect to the felon in possession charge.  Indeed, Petitioner maintains not that Ms. Jefferies misperceived anything about which she testified but that she purposefully lied for her own motive to get Petitioner out of the residence and regain custody of her daughter.  Moreover, Petitioner's theory that Ms. Jefferies should have been cast as a schizophrenic who could not properly remember anything would have cut against the strategy of asking the jury to believe the story she told SA Rhodes about hiding the gun herself.

Ms. Jennings' cross-examination of Ms. Jefferies elicited a motive for testimony adverse to Petitioner so that she could regain custody of her daughter.  Ms. Jennings succeeded in obtaining a concession that Ms. Jefferies had changed her story during the course of the investigation and at one time claimed to have hidden the gun in the attic herself. Ms. Jennings also highlighted all the testimony discrepancies, including between Ms. Jefferies and the officer about retrieval of the gun from the attic, in her closing argument. CR 112-259, doc. no. 130, pp. 25-27.  Judge Hall instructed the jury on credibility

determinations, and the jurors made their choice. Petitioner has not shown prejudice from Ms. Jennings' objectively reasonable choices in her treatment of Ms. Jefferies on the stand simply because the jury found him guilty on one of the two charges he faced.

### D.    Failing to Object

In grounds six and seven, Petitioner claims Ms. Jennings provided ineffective assistance of counsel by failing to object to unflattering testimony offered by Ms. Peloquin and by failing to object when the prosecutor asked SA Rhodes if he knew Ms. Jefferies was untruthful when she changed her story on how the gun ended up in the attic of Petitioner's residence.[3]  Neither assertion has merit.

#### 1.    Ms. Peloquin

According to Petitioner, Ms. Jennings should have objected to numerous "speculative" questions posed to Ms. Peloquin about her impressions of Petitioner and the relationship he had with Ms. Jefferies.  According to Petitioner, Ms. Peloquin's unflattering answers amounted to a complete assassination of his character.  (Doc. no. 12, p. 10.)  He offers no specific basis upon which Ms. Jennings could have objected simply because Ms. Peloquin gave answers to questions that specifically asked how she met Petitioner and how she observed Petitioner treated Ms. Jefferies.  See Trial Tr. 98-109.

To the extent Petitioner does not believe the testimony offered by Ms. Peloquin and supposes it was concocted to support Ms. Jefferies' testimony, credibility is the province of

---

[3]Although Petitioner stated in his original motion Ms. Jennings should have objected to unspecified testimony from Ms. Jefferies, he clarified in his reply that he meant Ms. Peloquin. (Doc. no. 12, pp. 10-11.)  In light of this clarification, and because Petitioner would not have been entitled to relief on his original, conclusory assertion lacking any specific details, see Caderno v. United States, 256 F.3d 1213, 1217 (11th Cir. 2001), the Court analyzes the claim as raised against Ms. Peloquin.

the jury. Johnson, 2016 WL 1019266, at *5. Moreover, Ms. Jennings asked Ms. Peloquin on cross-examination about which portions of her testimony were based on her own observations and personal knowledge, and she asked about why Ms. Peloquin's testimony about how many times she had heard Petitioner talked about a gun changed from her appearance before the grand jury and her testimony at trial. Trial Tr. 109-12. Importantly, Ms. Jennings argued in closing that all of Ms. Peloquin's unflattering testimony about Petitioner, as well as changing her story during the course of the investigation and trial about how many times she heard Petitioner talk about the gun, were all reasons to discredit her testimony. CR 112-259, doc. no. 130, pp. 27-28. Thus, the Court concludes Ms. Jennings' choosing not to object to unflattering portions of Ms. Peloquin's testimony but then using that testimony to challenge her credibility was a "reasonable, strategic choice made in the exercise of [her] professional judgment." Thomas, 596 F. App'x at 810.

Likewise, because Ms. Jennings addressed the unflattering testimony to which Petitioner now objects either in her cross-examination or pointed closing argument, Petitioner cannot establish a reasonable probability of a different outcome necessary to satisfy the prejudice prong of the ineffective analysis. See Strickland, 466 U.S. at 694.

### 2. SA Rhodes

Citing Snowden v. Singletary, 135 F.3d 732, 739 (11th Cir. 1998) and Federal Rule of Evidence 608(a), Petitioner asserts Ms. Jennings was ineffective for failing to object when SA Rhodes testified he could tell Ms. Jefferies was not being truthful when she changed her story in January 2013 about how the gun ended up in the attic. (Doc. no. 1, pp. 9, 14.) In his reply brief, Petitioner acknowledges the government "may be right" about the inapplicable

reference to <u>Snowden</u>, but he maintains that Rule 608(a) "restricts a party from attacking or supporting a witness's credibility." (Doc. no. 12, p. 11.) Petitioner's argument fails.

First, the government correctly distinguishes <u>Snowden</u>, where the Eleventh Circuit ruled improper bolstering of a witness occurred when an expert witness vouched for the credibility of child victims of sexual abuse in a case where the jury's opinion of the truthfulness of the children's story was crucial, particularly in the absence of other evidence of guilt. 135 F.3d at 738-39. Here, as discussed in detail above, the evidence of guilt was not limited to testimony from one source. Moreover, SA Rhodes testified after Ms. Jefferies had already admitted to lying to him when she changed her story in January of 2013, and Ms. Jennings' had cross-examined Ms. Jefferies about her deception. Trial Tr. 72-78, 83-84.

Second, Rule 608(a) *allows* a witness's credibility to "be attacked or supported by testimony the witness's reputation for having a character for truthfulness or untruthfulness, or by testimony in the form of an opinion about that character," after the witness's character for truthfulness has been attacked. Thus, Petitioner's interpretation of the Rule is incorrect, and his citation to it does not help him.

In sum, Ms. Jennings' failure to object to SA Rhodes' comment about Ms. Jefferies' untruthfulness in January of 2013, which merely corroborated what Ms. Jefferies herself already admitted, was neither deficient nor prejudicial.

### E.    Attorney-Client Relationship

In the remaining grounds four and five, Petitioner faults Ms. Jennings for not sooner recognizing a breakdown in the attorney-client relationship, which Petitioner claims unfairly hampered his trial preparation. Petitioner states the substance of what he now asserts he would have told the jury had he testified, but he offers no specifics or factual detail as to how

Ms. Jennings' time table for trial preparation or recognition of a communication breakdown was deficient or prejudiced the case outcome. (<u>See generally</u> doc. no. 1, pp. 7-9; doc. no. 12, pp. 8-10.) The letters addressed to Ms. Jennings and attached to the § 2255 motion demonstrate Petitioner and Ms. Jennings were communicating about Petitioner's case, and show that some of the issues Petitioner had with Ms. Jennings were actually issues over which she had no control because a different attorney represented Petitioner in his proceedings in state court with respect to the attempt to overturn his conviction for terroristic threats. (Doc. no. 1, pp. 22-28.)

As set forth in detail in Part I(A) & (C), two motions challenging Ms. Jennings' appointment to represent Petitioner were filed prior to the commencement of trial, and one was filed prior to sentencing. CR 112-259, doc. nos. 58, 78, 101. The Court held *ex parte* hearings on all three motions and extensively questioned Petitioner and Ms. Jennings about their attorney-client relationship and trial preparation. The Court, not Ms. Jennings, made the rulings that determined the sufficiency of the relationship such that Petitioner was not entitled to new counsel. Indeed, the undersigned determined in August of 2013 that Ms. Jennings was filing pretrial motions and meeting with Petitioner to prepare for trial. <u>Id.</u>, doc. no. 60. Again, on the morning of trial, Judge Hall found Ms. Jennings had filed appropriate pretrial motions, was prepared to proceed to trial, and found no fault in her offering advice to Petitioner about the option of accepting a plea agreement. <u>Id.</u>, doc. no. 135. Ms. Jennings did not provide ineffective assistance by following the Court's directives to continue with her representation of Petitioner.

Petitioner's current arguments are little more than a variation on the same theme repeated to the undersigned and to Judge Hall at the *ex parte* hearings that he was not happy

she had advised him about considering a plea agreement. As summarized by the Eleventh Circuit, "The district court also noted that defense attorneys commonly advise clients about the option of entering a guilty plea and that such advice was no indication that a lawyer was unable or unwilling to represent zealously the client at trial." United States v. Hobbs, 619 F. App'x 843, 845 (11th Cir. 2015). The Eleventh Circuit also recognized, "Although [Petitioner] was dissatisfied with aspects of his lawyer's representation, [Petitioner] and his lawyer had many discussions about trial strategy." Id. The letters attached to Petitioner's § 2255 motions, as well as his testimony during the *ex parte* hearings confirm this conclusion.

Petitioner complains Ms. Jennings "took" his right to testify from him by not going through questions to ask him until the Friday before his trial was scheduled to start on Monday. (Doc. no. 12, p. 9.) Of course, Petitioner points to nothing in the record showing that he was prevented from testifying, or how, specifically, Ms. Jennings was not willing and able to prepare him to testify at trial if he desired. Indeed, according to the statements of both Ms. Jennings and Petitioner at the *ex parte* hearing on the morning of jury selection, it was a disagreement during the preparation of his trial testimony that caused their most serious breakdown in communication. CR 112-259, doc. no. 135, pp. 2-9. Nevertheless, by not testifying, the government was unable to impeach Petitioner with his terroristic threats conviction in a case that involved physical violence and threats by him. Likewise, because Petitioner did not present his theory of not "seriously" hurting Ms. Jefferies, the graphic pictures of her injuries were not presented to the jury.

To the extent Petitioner stakes his claims about trial preparation on Ms. Jennings' failure to follow his wishes on strategic matters, such as how to question witnesses or which

objections to make, as discussed above, those are quintessential issues of professional judgment deserving deference. Moreover, Petitioner has not identified any issues which Ms. Jennings did not reasonably address.

For example, Petitioner complains the "failed attempt" at preparing him to testify prevented him from telling the jury that Ms. Jefferies spiked his beer, which caused an "unprecedented sleep-walking incident" in which he physically attacked Ms. Jefferies. (Doc. no. 1, p. 8.) Yet he also admits he "cannot prove it." (Id.) He was also not able to testify that he has never inflicted serious bodily injury on another person, despite (1) photographic proof of the beating he inflicted on Ms. Jefferies on the night of his arrest that Ms. Jennings managed to keep from the jury, and (2) a report from his court-ordered psychiatric examination, (CR 112-259, doc. no. 35), that revealed a lengthy arrest record including multiple charges for battery and assault, a conviction for terroristic threats, and reports from a family member of a "long history of aggressive and impulsive behaviors" that at times resulted in threats, as well as physical and verbal altercations with others for which Petitioner rarely displayed remorse.

Knowing all of this, Ms. Jennings prepared for trial, as reported multiple times to the undersigned and to Judge Hall, and followed a strategy that resulted in an acquittal on the most serious charge Petitioner faced. The record shows the manner in which Ms. Jennings handled trial preparation and her tumultuous relationship with Petitioner was objectively reasonable. Likewise, Petitioner cannot satisfy the prejudice prong of Strickland. His entire prejudice argument rests on the wholly untenable position that his testimony alone, in the face of contrary testimony corroborated by multiple witnesses, would have resulted in acquittal on the felon in possession charge. To the contrary, the record reveals Ms. Jennings

performed admirably in the face of daunting obstacles, and although Petitioner was convicted on one count, Ms. Jennings secured an acquittal on the most serious charge faced by Petitioner.  He is not entitled to relief on grounds four or five.

## III.     CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** the request for an evidentiary hearing be **DENIED**, (doc. no. 4), the § 2255 motion be **DENIED**, this civil action be **CLOSED**, and a final judgment be **ENTERED** in favor of Respondent.

SO REPORTED and RECOMMENDED this 27th day of May, 2016, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA